UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

LINDA CALDWELL,
                **Plaintiff,**

                    **vs.**                       **00-1319**

LT. ELIZABETH, et al.,
                  **Defendants.**

        Before the court are the defendants', Janice Miller, Elizabeth (McEwing) Thorson, Kevin White[1], Danna Spaulding[2], Terry Norgaard[3], Grover Gleckler, Christina Cole[4], and James McCarthy's[5], summary judgment motion, d/e 70, and the plaintiff's response, d/e 82.

        The plaintiff filed a complaint against the defendants for alleged events that occurred while she was incarcerated at the Dwight Correctional Center.  Specifically, the plaintiff alleges that 1) defendant Miller violated the plaintiff's Eighth and Fourteenth Amendment rights when she was deliberately indifferent to the plaintiff's serious medical needs; 2) defendants McEwing, McCarthy, Gleckler, White, and Norgaard violated plaintiff's Fourth and Eighth Amendment rights by performing a strip search of the plaintiff and having male officers present during the strip search; 3) defendants Thorson (McEwing), McCarthy and Gleckler violated the plaintiff's Eighth Amendment rights when they used excessive force against her; 4) defendant McEwing violated the plaintiff's Eighth Amendment rights when she refused to provide the plaintiff with clean under garments and a sanitary napkin; 5) defendants McEwing, McCarthy, and Gleckler violated the plaintiff's Eighth and Fourteenth Amendment rights when they denied her access to her eyeglasses and intentionally conspired to destroy her eyeglasses; 6) defendants McEwing, White, and Norgaard violated the plaintiff's Fourth, Eighth, and Fourteenth Amendment rights when the plaintiff was placed in body restraints and received psychiatric treatment in a stripped cell; 7) defendants Spaulding, Cole, and Norgaard failed to intervene and protect the plaintiff; 8) defendants Thorson (McEwing), McCarthy, and Gleckler committed the tort of assault and battery of the Plaintiff; and 9) defendant Thorson violated the plaintiff's constitutional right because she was verbally abusive to the plaintiff.

---

[1]Sued as Lt. White.

[2]Sued as Sergeant Spaulding.

[3]Sued as Terry Norgard.

[4]Sued as Cole.

[5]Sued as McCarthy.

The defendants assert that plaintiff's claim concerning the unconstitutional use of force is barred by Heck v. Humphrey, 114 S.Ct. 2364 (1994) and Okoro v. Callaghan, 324 F.3d 488 (7 Cir. 2003) and that any force taken on May 4, 1997 was as a direct result of the plaintiff's own actions. Further, the defendants assert that the plaintiff's Fourth, Eighth, and Fourteenth Amendment rights were not violated when she was required to be strip searched due to her transfer into the segregation unit and due to being placed in the shower area and being brought back to her cell. Defendants also assert that the plaintiff's constitutional rights were not violated concerning her medical care, eyeglasses, or verbal statements made to her. The defendants also assert that on these facts, they are entitled to qualified immunity. Therefore, the defendants ask this court to grant their summary judgment motion.

### Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Herman v. National Broadcasting Co., Inc.,* 744 F.2d 604, 607 (7th Cir. 1984), *cert. denied,* 470 U.S. 1028 (1985). In determining whether factual issues exist, the court must view all the evidence in the light most favorable to the non-moving party. *Beraha v. Baxter Health Corp.,* 956 F.2d 1436, 1440 (7th Cir. 1992).

However, Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party there is no 'genuine' issue for trial." *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359 (7th Cir. 1988). A "metaphysical doubt" will not suffice. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Disputed facts are material only if they might affect the outcome of the suit. *First Ind. Bank v. Baker,* 957 F.2d 506, 507-08 (7th Cir. 1992). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, *247-248, 106 S.Ct. 2505, 2510 (1986).

### Material Facts Claimed To Be Undisputed Facts

2

1.      On May 4, 1999, the plaintiff was moved from the Mental Health Unit to Cottage 15, North 9, segregation as a result of her assaulting correctional staff earlier in the day. (defendants' exhibit A, plaintiff's deposition, p. 11, l. 1-9, p. 13, l. 1-24; defendants' exhibit B, Thorson affidavit, ¶ 3).

2.      After arriving in segregation, the plaintiff was initially strip searched by defendants Cole and McEwing. (plaintiff's amended complaint, ¶ 58, 62; defendants' exhibit A, plaintiff's deposition, p. 15, l. 3-22; defendants' exhibit B, Thorson affidavit, ¶ 5).

3.      Defendant McEwing allegedly called the plaintiff a "bitch" and "stupid".  (defendants' exhibit A, plaintiff's deposition, p. 14, l. 17-22).

4.      All inmates are strip searched upon entering segregation to determine whether the inmate has contraband, hidden or otherwise, on her person. (defendants' exhibit A, plaintiff's deposition, p. 17, l. 2-8; defendants' exhibit B, Thorson affidavit, ¶ 6).

5.      The plaintiff was told that her property was not in Cottage 15 and that she would receive her own property after it had been inventoried. (plaintiff's amended complaint; defendants' exhibit B, Thorson affidavit, ¶ 4).

6.      After the strip search, the plaintiff was given a sanitary pad and a segregation uniform. (plaintiff's amended complaint, ¶ 63; defendants' exhibit A, plaintiff's deposition, p. 15, l. 18-20; defendants' exhibit B, Thorson affidavit, ¶ 7).

7.      At the time, if the plaintiff had soiled underwear, defendants Thorson and Cole would not have had the plaintiff's property to have provided her with any clean underwear.  (defendants' exhibit B, Thorson affidavit, ¶ 8).

8.      Once the plaintiff's property was brought to her, she would have had the ability to change into clean underwear. (defendants' exhibit B, Thorson affidavit, ¶ 8).

9.      Defendant Cole brought the plaintiff bedding and food trays. (defendants' exhibit A, plaintiff's deposition, p. 18, l. 1-5, p. 22, l. 17-19).

10.     Defendant Thorson was notified by correctional staff that the plaintiff, who was single celled, had blood and urine coming out from under her door and leaking into the hallway. (defendants' exhibit A, plaintiff's deposition, p. 25, l. 25, p. 26, l. 1; defendants' exhibit B, Thorson affidavit, ¶ 9).

3

11.     Defendant Thorson showed the blood and urine to defendant Norgaard who told her to have the blood and urine cleaned up since it created a health and sanitation violation. (defendants' exhibit B, Thorson affidavit, ¶ 10-11; defendants' exhibit C, Norgaard affidavit, ¶ 4-5).

12.     The plaintiff was told that she would need to clean up the blood and urine.  (plaintiff's amended complaint, ¶ 71; defendants' exhibit A, plaintiff's deposition, p. 25, l. 13-20).

13.     Defendants Thorson and Gleckler went to the plaintiff's cell with a bucket and mop. (plaintiff's amended complaint, ¶ 73; defendants' exhibit A, plaintiff's deposition, p. 26, l. 2-23; defendants' exhibit B, Thorson affidavit, ¶ 13; defendants' exhibit D, Gleckler affidavit, ¶ 7).

14.     Defendant Spaulding was at her post at the end of the hall and did not personally observe what happened in the plaintiff's cell on May 4, 1999. (defendants' exhibit E, Spaulding affidavit, ¶ 6, 11).

15.     Since the plaintiff's cell door would have to be opened, institutional rules required that she be handcuffed.  (defendants' Exhibit B, Thorson affidavit, ¶ 14; defendants' exhibit D, Gleckler affidavit, ¶ 10).

16.     Defendant Thorson was the cell house supervisor and had the authority to authorize the plaintiff's cell door to be opened.  (defendants' exhibit B, Thorson affidavit, ¶ 17; defendants' exhibit D, Gleckler affidavit, ¶ 13).

17.     The plaintiff's acccount of the events on May 4, 1999 with defendants Gleckler, McCarthy, and Thorson is that she was not doing anything wrong and the defendants just "bum rushed" her.  (defendants' Exhibit A, plaintiff's deposition, p. 28-30).

18.     The plaintiff was given three direct orders to back up to the door to be cuffed up, however, she stayed on her bed and would not cuff up.  (plaintiff's amended complaint, ¶ 73; defendants' exhibit B, Thorson affidavit, ¶ 15; defendants' exhibit D, Gleckler affidavit, ¶ 11).

19.     The plaintiff's door was then opened and defendant Thorson observed that it was smeared with blood, and she attempted to clean the door by spraying it down.  (defendants' exhibit B, Thorson affidavit, ¶ 18-19).

20.     Meanwhile, defendant Gleckler stood in the door of the cell and continued to order the plaintiff to cuff up; she continued to refuse. (plaintiff's amended complaint, ¶ 74; defendants' exhibit B, Thorson affidavit, ¶ 19-20; defendants' exhibit D, Gleckler affidavit, ¶ 16).

21.     The plaintiff jumped off of the bed, grabbed a food tray off of the sink, cursed at defendant Thorson, and threw the food tray at defendants Thorson and Gleckler.(defendants' exhibit B, Thorson affidavit, ¶ 21).

22.     The plaintiff then obtained the mop head and swung and hit defendant Gleckler in the head. (defendants' exhibit B, Thorson affidavit, ¶ 22; defendants' exhibit D, Gleckler affidavit, ¶ 18).

23.     After defendant Gleckler had been hit in the head, defendant McCarthy arrived and pushed past defendant Thorson and into the room where he and defendant Gleckler tried to get the mop from the plaintiff. (defendants' exhibit B, Thorson affidavit, ¶ 23; defendants' exhibit D, Gleckler affidavit, ¶ 19; defendants' exhibit F, McCarthy affidavit, ¶ 15).

24.     During this, the plaintiff yelled at the defendants to get out of her room, swore, attempted to bite the defendants, punched defendant McCarthy in the face three times with her right fist, elbowed defendant McCarthy once in the head with her left elbow, kicked defendant McCarthy several times, and attempted to run out into the hallway.  (defendants' Exhibit A, plaintiff's deposition, p. 29, l. 18-19; defendants' exhibit B, Thorson affidavit, ¶ 25; defendants' exhibit D, Gleckler affidavit, ¶ 20; defendants' exhibit F, McCarthy affidavit, ¶ 16).

25.     Defendant Eckleberry arrived to offer assistance. (defendants' exhibit B, Thorson affidavit, ¶ 26; defendants' exhibit D, Gleckler affidavit, ¶ 21; defendants' exhibit F, McCarthy affidavit, ¶ 17).

26.     After some slipping and falling in blood, urine, feces, and food, the defendants were able to cuff the plaintiff with her hands behind her  back. (plaintiff's amended complaint, ¶ 77; defendants' exhibit B, Thorson affidavit, ¶ 27; defendants' exhibit D, Gleckler affidavit, ¶ 22).

27.     After the plaintiff was handcuffed, the defendants attempted to walk her from the cell, however, the plaintiff continued to be uncooperative and combative towards all correctional staff. (defendants' exhibit B, Thorson affidavit, ¶ 28; defendants' exhibit D, Gleckler affidavit, ¶ 23; defendants' exhibit F, McCarthy affidavit, ¶ 20).

28.     The plaintiff contends that she was trying to get to her feet but that she was being dragged.  (defendants' exhibit A, plaintiff's deposition, p. 30, l. 15-24, p. 31, l. 1-2).

29.     The plaintiff's actions required the defendants either to forcibly pull and/or carry her from the room.  (plaintiff's amended complaint, ¶ 80; defendants' exhibit B, Thorson affidavit, ¶ 28; defendants' exhibit D, Gleckler affidavit, ¶ 23; defendants' exhibit F, McCarthy affidavit, ¶ 20).

30.     As a result of the plaintiff's actions on May 4, 1997, defendants Gleckler and McCarthy wrote the plaintiff disciplinary reports for dangerous contraband, violent assault of any person, disobeying a direct order, assaulting any person, and health and safety violations. (defendants' exhibit D, Gleckler affidavit, ¶ 37; defendants' exhibit F, McCarthy affidavit, ¶ 32).

31.     The plaintiff was found guilty of charges and had the following discipline recommended and approved: revocation of six months of good time, placement in segregation for one year, demoted to C-grate for one year, and mental health counseling. (defendants' exhibit D, Gleckler affidavit, ¶ 38; defendants' exhibit F, McCarthy affidavit, ¶ 33).

32.     The plaintiff appealed this discipline to the Administrative Review Board which eventually denied the plaintiff's appeal. (defendants' Exhibit G, Anderson affidavit, ¶ 3, 9, 10, 12).

33.     While the plaintiff was being removed from her cell and escorted down the hallway, the plaintiff bit defendant Gleckler's left hand. (defendants' exhibit D, Gleckler affidavit, ¶ 25).

34.     Defendant Spaulding was ordered to open the wing door which was opened and the plaintiff was secured in the shower until the house-help inmates cleaned up her cell. (defendants' exhibit A, plaintiff's deposition, p. 31, l. 7-15;  defendants' exhibit B, Thorson affidavit, ¶ 31; defendants' exhibit D, Gleckler affidavit, ¶ 26' defendants' exhibit E, Spaulding affidavit, ¶ 14).

35.     The plaintiff continued to yell, call correctional staff names and pound on something while she was in the shower.  (defendants' exhibit F, McCarthy affidavit, ¶ 23).

36.     The defendants Cole, McCarthy, Thorson and White escorted the plaintiff from the dayroom shower to C-15 N-03. (defendants' exhibit H, White affidavit, ¶ 5).

37.     Since the plaintiff had been taken out of her cell and to the shower, procedure required that another strip search of her be conducted to ensure that she had not obtained any contraband

while in the shower. (defendants' Exhibit B, Thorson affidavit, ¶ 32; defendants' exhibit D, Gleckler affidavit, ¶ 27; defendants'exhibit H, White affidavit, ¶ 6).

38.     Defendant Gleckler and other male officers were present in the hallway when the plaintiff was strip searched in her cell in case she became violent again.  (defendants' exhibit B, Thorson affidavit, ¶ 33; defendants' exhibit D, Gleckler affidavit, ¶ 28; defendants' exhibit H, White affidavit, ¶ 7).

39.     At no time on May 4, 1999, was the plaintiff strip searched in front of male correctional staff.  (defendants' exhibit B, Thorson affidavit, ¶ 34; defendants' exhibit D, Gleckler affidavit, ¶ 28; defendants' exhibit H, White affidavit, ¶ 9).

40.     Later on May 4, 1999, the plaintiff was placed in mental health therapeutic restraints for up to 16 hours for her medical safety and for the safety of correctional staff as ordered by Dr. Steven Rivera.  (defendants' exhibit B, Thorson affidavit, ¶ 35; defendants' exhibit D, Gleckler affidavit, ¶ 31; defendants' Exhibit H, White affidavit, ¶ 10; defendants' exhibit I, Miller affidavit, ¶ 4-5).

41.     Mental health therapeutic restraints are four leather restraints used to hold an inmate in a supine position in her bed. (defendants' Exhibit B, Thorson affidavit, ¶ 36; defendants' exhibit D, Gleckler affidavit, ¶ 32; defendants' exhibit H, White affidavit, ¶ 11; defendants' exhibit I, Miller affidavit, ¶ 6).

42.     If an inmate is ordered to be placed in mental health therapeutic restraints, all of her personal property is removed from the cell and she is periodically visited by a nurse or other qualified individual to ensure that the restraints have been correctly applied and to ensure that the  inmate is not under any medical distress. (defendants' exhibit B, Thorson affidavit, ¶ 37-38; defendants' exhibit D, Gleckler affidavit, ¶ 33-34; defendants' exhibit H, White affidavit, ¶ 12-13; defendants' exhibit I, Miller affidavit, ¶ 7-8).

43.     On May 4, 1999 at around 10:05 p.m. Nurse Singleton was present to ensure that the mental health therapeutic restraints would not restrict the plaintiff's circulation. (defendants' exhibit I, Miller affidavit, ¶ 9).

44.     The plaintiff was seen by nursing staff on May 4, 1999 at 11:50 p.m., at which time, the plaintiff stated that her left shoulder hurt. (defendants' exhibit I, Miller affidavit, ¶ 10).

45.     The nurse noted that no injuries or pain in the left shoulder and that circulation to all four extremities was good.  (defendants' exhibit I, Miller affidavit, ¶ 10).

46.     The plaintiff was again seen by nursing staff on May 5, 1999 at 5:30 a.m. at which time the plaintiff stated that she needed to use the bed pan and have a drink.  (defendants' exhibit I, Miller affidavit, ¶ 11).

47.     The nurse noted that the plaintiff had good circulation to all four extremities and good color, she also used the bed pan, but there was no urination.  (defendants' exhibit I, Miller affidavit, ¶ 11).

48.     The plaintiff was given water and a new Depends was put on her.  (defendants' exhibit I, Miller affidavit, ¶ 11).

49.     On May 5, 1999 at around 9:00 a.m., defendant Miller was called to Unit C-15 to check the plaintiff for injuries. (defendants' exhibit I, Miller affidavit, ¶ 12).

50.     At this time, the plaintiff told defendant Miller that correctional officers hurt her last night.  (defendants' exhibit I, Miller affidavit, ¶ 12).

51.     Defendant Miller observed the plaintiff in mental health restraints, lying on her back, on a stripped bed, with a paper sheet and a diaper. (defendants' exhibit I, Miller affidavit, ¶ 13).

52.     Defendant Miller noticed the plaintiff had a ½ inch long cut on her right middle finger and a swollen area above her left eye such that the left eyelid was swollen, but not swollen shut. (defendants' exhibit I, Miller affidavit, ¶ 14).

53.     Defendant Miller cleansed this cut. (defendants' exhibit I, Miller affidavit, ¶ 14).

54.     The plaintiff stated that she had a lump on the back of her head which defendant Miller was unable to successfully determine since the plaintiff had a bumpy head.  (defendants' exhibit I, Miller affidavit, ¶ 14).

55.     The plaintiff also stated that her wrists were injured, however, due to the plaintiff's race, African-American, it was difficult for defendant Miller to visualize any redness. (defendants' exhibit I, Miller affidavit, ¶ 14).

8

56.     Defendant Miller did not notice any other injuries to the plaintiff that required medical treatment. (defendants' exhibit I, Miller affidavit, ¶ 15).

57.     On May 5, 1999 at around 1:35 p.m. the mental health restraints were removed from the plaintiff, however, she remained on ten minute watches.  (defendants' exhibit I, Miller affidavit, ¶ 16).

58.     On May 6, 1999 at around 2:20 p.m. the plaintiff saw a psychologist, Gene Peterson who determined that the plaintiff no longer needed to be on suicide watch and also stated that she could have her personal property according to segregation status rules. (defendants' exhibit I, Miller affidavit, ¶ 17-18).

59.     Other than the plaintiff being seen by Dr. Peterson, there is no record of her refusing to take a HIV test on May 6, 1999. (defendants' exhibit I, Miller affidavit, ¶ 19).

60.     Defendant Miller does not recall the plaintiff coming to the Healthcare Unit on May 6, 1999 for a HIV test or to be seen by Dr. Sood. (defendants' exhibit I, Miller affidavit, ¶ 20).

61.     If the plaintiff came to the Healthcare Unit that day and refused to take a HIV test, Defendant Miller would not have refused to provide her medical care.  (defendants' exhibit I, Miller affidavit, ¶ 20).

62.     On May 20, 1999, the plaintiff was seen by the eye doctor and provided a new prescription. (defendants' exhibit I, Miller affidavit, ¶ 21).

63.     However, the plaintiff requested to obtain her eyeglasses from home.  (defendants' exhibit I, Miller affidavit, ¶ 22).

64.     A May 20, 1999 permission slip was sent to personal property to allow the plaintiff to have the eyeglasses from home.  However, the eyeglasses never came from home. (defendants' exhibit I, Miller affidavit, ¶ 22).

65.     The plaintiff was not charged for any eyeglasses since she was supposed to obtain them from home.  (defendants' exhibit I, Miller affidavit, ¶ 22).

66.     The defendants do not recall if the plaintiff had eyeglasses on May 4, 1999 and have no recollection of said eyeglasses being taken or mis-placed. (defendants' exhibit B, Thorson

affidavit, ¶ 39; defendants' exhibit C, Norgaard affidavit, ¶ 17; defendants' exhibit D, Gleckler affidavit, ¶ 35; defendants' exhibit E, Spaulding affidavit, ¶ 18; defendants' exhibit F, McCarthy affidavit, ¶ 30; defendants' exhibit H, White affidavit, ¶ 15).

67.      The plaintiff was not wearing her glasses on May 4, 1999 but she believes her glasses were thrown away by an unknown officer. (defendants' exhibit A, Plaintiff's deposition, p. 42, l. 1-24).

68.      The plaintiff currently has eyeglasses. (defendants' exhibit A, plaintiff's deposition, p. 63, l. 22-24, p. 64, l. 1-9).

The court notes that in response, the plaintiff filed the "Plaintiff's Statement of Undisputed Factual Issues." See d/e 82. However, the plaintiff has not made a statement concerning material facts, disputed or otherwise. Instead the plaintiff's statements are questions. Furthermore, the plaintiff's "Declaration" merely restates various paragraphs from her complaint. See d/e 81. However, in response to a motion for summary judgment, the non-moving party cannot merely rely on allegations made within his pleadings, i.e. complaint. *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 178 (7th Cir. 1994); *Warsco v. Preferred Technical Group*, 258 F.3d 557, 563 (7 Cir. 2001). Instead, the non-moving party must go beyond the pleadings and support his or her assertions with documentary evidence. *Warsco*, 258 F.3d at 563. Furthermore, exhibits B-D attached to the plaintiff's declaration do not stand for or state what plaintiff claims they do. Exhibit B, a medical progress note for May 5, 1999, does not state or show that the plaintiff "layed (sic) for two days with menstrual blood on my lower part of my body [sic]." (plaintiff's declaration, ¶ 16). Exhibit C shows that the plaintiff went to a clinic from 9:30 a.m. to 10:00 a.m. on May 6, 1999. Exhibit C does not show that: "Dr. Sood and Janice Miller told me that if I don't take a blood test they would not exam me and would put down that I refused treatment. So I was returned to C-15 in tears and upset" or that the clinic was held in the Healthcare Unit or what the Clinic was. (plaintiff's declaration, ¶ 17). Exhibit D does not show that the plaintiff told Dr. Puisi that "staff jumped on her" and that her pain was due to how she sat in a chair in her cell. However, the plaintiff's exhibit G does show that she allegedly told Correctional Officer Hitch that Defendants McEwing, Gleckler, and McCarthy came to her door; they opened it; and the plaintiff told them to get out of her room and threw the mop bucket out of the room.

## Discussion

First, the plaintiff's claims of excessive force and assault and battery by the defendants McEwing, McCarthy, and Gleckler are barred by *Heck v. Humphrey*, 114 S. Ct. 2364 (1994). Additionally, a suit for damages under § 1983 that challenges an underlying conviction or sentence, or challenges "actions whose unlawfulness would render a conviction or sentence invalid," does not

accrue until that conviction or sentence has been invalidated.[6]  *Heck v. Humphrey*, 512 U.S. 477, 484-487 (1994).  In *Edwards v. Balisok*, 520 U.S. 641 (1997), the Supreme Court extended this ruling to include § 1983 suits for damages "challenging the loss of good time credits in prison disciplinary actions (when the fact or duration of confinement was implicated)" even if the plaintiff did not seek a restoration of good time.  *DeWalt v. Carter*, 224 F.3d 607, 615 (7th Cir. 1999), *citing Edwards v. Balisok,* 520 U.S. at 648.  Therefore, claims that "necessarily impl[y] the invalidity of the punishment imposed (i.e., loss of good time credits) . . . [are] not cognizable under § 1983" until the prison disciplinary decision has been invalidated.  *Id.*  Here, the defendants Glecker and McCarthy issued a disciplinary ticket against the plaintiff for the May 4, 1999 incident plaintiff was issued a disciplinary ticket wherein she was charged with several violations, including violent assault of any person.  The plaintiff was found guilty of the charge and her punishment included revocation of six months of good time.  The plaintiff appealed this discipline to the Administrative Review Board who eventually denied the plaintiff's appeal.  *See* defendants' exhibit G, Anderson affidavit, ¶ 3, 9, 10, 12.  The plaintiff's allegations against the defendants concerning the use of force and failure to intervene necessarily imply the invalidity of the discipline related to the events of May 4, 1999.  The plaintiff has not proven that she has had the outcome of the May 4, 1999 disciplinary report overturned.  Therefore, *Heck* applies.  The plaintiff's claims of excessive force and assault and battery by the defendants McEwing, McCarthy, and Gleckler are dismissed, without prejudice.


The strip search of an inmate may violate either the Fourth or the Eighth Amendment.  *Calhoun v. DeTella*, 319 F. 3d 936 (7th Cir. 2003); *Peckham v. Wisconsin Dept. of Corrections*, 141 F. 3d 694 (7th Cir. 1998).  However, the *Peckham* Court also stated that "it is difficult to conjure up too many real-life scenarios where prison strip search of inmates could be said to be unreasonable under the Fourth Amendment."  114 F.3d at 697.  Strip searches conducted in front of or by the opposite sex does not necessarily violate the Eighth Amendment.  *Johnson v. Phelan*, 69 F.3d 144, 146-51 (7th Cir. 1995).  "[O]nly those strip searches that are maliciously motivated, unrelated to institutional security, and hence totally without penological justification are unconstitutional."  *Whitman v. Nesic*, 368 F.3d 931, 934 (7th Cir. 2004) *quoting Meriwether v. Faulkner*, 821 F. 2d 408, 418 (7th Cir. 1987); *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981).  "In other words, the search must amount to 'calculated harassment unrelated to prison needs with the intent to humiliate and inflict psychological pain.'"  *Id.  quoting Meriwether*, 821 F.2d at 418; *Filmore v. Page*, 358 F.3d 496, 505 (7th Cir. 2004).  "There is no question that strip searches may be unpleasant, humiliating, and embarrassing to prisoners, but not every psychological discomfort a prisoner endures amounts to a constitutional violation." *Calhoun*, 319 F.3d at 939.  In this case, the defendants had a penological reason and interest in searching the plaintiff.  The plaintiff was moved to segregation as a result of assaulting staff.  Procedures require that when an inmate is taken to segregation, all inmates are searched upon entering

---

[6]The underlying conviction or sentence is invalidated if it is "reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such a determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. Section 2254."  *Heck v. Humphrey*, 512 U.S. at 486-487.

segregation to determine whether the inmate has contraband on his person.  Further, procedures required that a search was performed on the plaintiff when she was taken out of her cell to the shower. Since the plaintiff had assaulted staff earlier in the day, the defendants had an interest in determining whether the plaintiff had any contraband that she could use to harm herself or others.  Furthermore, no reasonable inference arises from the facts that the searches in this case, even had one of the searches been done in front of male officers, were conducted in an abusive or malicious manner.  The defendants, McEwing, McCarthy, Gleckler, White, and Norgaard are entitled to summary judgment on this claim.

The defendant, McEwing is entitled to summary judgment on the plaintiff's claim that defendant McEwing was verbally abusive to her.  Even if McEwing used derogatory language, it does not amount to a constitutional violation.  The alleged use of racial and/or derogatory language in and of itself, is not enough to establish a violation of a constitutional right, nor does it deprive an inmate of a protected liberty or property interest or deprive an inmate of equal protection under the law. *DeWalt v. Carter*, 224 F. 3d 607, 612 (7th Cir. 2000); *Patton v. Przybyliski*, 822 F.2d 697, 700 (7th Cir. 1987).

Further, the defendants are entitled to summary judgment on the plaintiff's claims concerning conditions of confinement and medical care.

Prison officials cannot deprive inmates of the "minimal civilized measure of life's necessities."  Rhodes v. Chapman, 452 U.S. 337, 347 (1981), yet they are not required to provide "the amenities, conveniences and services of a good hotel." *Harris v. Fleming*, 839 F.2d 1232, 1235 (7 Cir. 1988).  "Conditions that are merely harsh or unpleasant do not amount to cruel and unusual punishment and, absent physical harm, temporary sanitation problems do not support an Eighth Amendment claim. *Morissette v. Peters*, 45 F.3d 1119 (7 Cir. 1995).  Prison employees are liable for inmate exposure to cruel and unusual conditions of confinement only where they have the requisite knowledge and intent. The official must know about the inhumane conditions and disregard an excessive risk to inmate health and safety. *Farmer v. Brennan*, 114 S.Ct. 1970, 1979 (1994).  While a state must provide a prisoner with "'adequate ventilation, sanitation, bedding, hygienic materials and utilities', "[n]eglect, indifference, or discomfort, though, are not sufficient to establish an eighth amendment claim." *Martin v. Lane*, 766 F. Supp. 641, 647 (N.D. Ill. 1991) *quoting Ramos v. Lamm*, 639 F.2d 559, 568 (10 Cir. 1980). Furthermore, when the conditions are temporary, affect a few inmates, and cause no physical harm, an Eighth Amendment violation will not be found.  *Harris v. Fleming*, 839 F.2d 1232, 1235 (7 Cir. 1988).

In *Estelle v. Gamble*, 429 U.S. 97 (1976), the Supreme Court held that in order to violate a prisoner's Eighth Amendment rights as they relate to medical care, it must be shown that: 1) the inmate must have a serious medical need, and 2) an official must act with deliberate indifference to the serious medical need of that inmate. 429 U.S. 97, 104 (1976).  The Court concluded that "deliberate indifference to the serious medical needs of prisoners" constitutes the

"unnecessary and wanton infliction of pain." 429 U.S. 97, 104 (1976).  However, the Court drew a distinction between an "inadvertent failure to provide adequate medical care," Estelle at 105, and "an unnecessary and wanton infliction of pain" that is "repugnant to the conscience of mankind." *Estelle* at 106.

> To raise an Eighth Amendment issue, 'the infliction [of punishment] must be deliberate or otherwise reckless in the criminal law sense, which means that the defendant must have committed an act so dangerous that his knowledge of the risk can be inferred or that the defendant actually knew of an impending harm easily preventable'.

*Snipes v. Detella*, 95 F.3d 586, 590, *citing Antonelli v. Sheahan*, 81 F.3d 1422, 1427 (7 Cir. 1995).  As such, deliberate indifference to a serious medical need requires the official to "know of and disregard an excessive risk to [an] inmate's health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer v.Brennan*, 114 S.Ct. 1970, 1979 (1994). "[M]ere negligence or even gross negligence does not constitute deliberate indifference." Id., *citing Wilson v. Seiter*, 501 U.S. 294, 305 (1991).  In addition, the Eighth Amendment does not provide that an inmate is entitled to demand specific care, nor does it entitle him to the best care that is available.  *Forbes v. Edgar*, 112 F.3d 262, 267 (7 Cir. 1997).  A prisoner's constitutional rights can be restricted based on a penal institution's legitimate goals and policies, including institutional security.  *Martin v. Lane*, 766 F. Supp. 641, 645 (N.D. Ill. 1991).

In this case, the plaintiff was provided a clean segregation uniform, a sanitary pad, and Depends.  The plaintiff was also seen on multiple occasions by medical staff and provided medical attention.  The only injury to the plaintiff was a swollen area above her left eye and a ½ inch long cut on her right middle finger.  The medical care she received was provided to her while she was in mental health included therapeutic restraints.  These restraints were ordered by Dr. Rivera, not the defendants.  Given that she had assaulted three correctional staff members it was not unlikely that a medical professional would order her to be restrained to protect herself and others.  Furthermore, there is no evidence to show that the plaintiff was physically injured by not having eyeglasses.   The plaintiff saw a doctor and received a new prescription for glasses.  However, the plaintiff decided she wanted to obtain her glasses from home, and she currently has eyeglasses.  The plaintiff has not provided the necessary information to establish a prima facie case of a constitutional violation under the Eighth Amendment.  The defendants are entitled to summary judgment on the plaintiff's claims for inhumane condition of confinement, failure to intervene and deliberate indifference to serious medical needs.

As a result of the foregoing, the plaintiff's claim that Spaulding, Cole and Norgaard failed to intervene also fails and these defendants are entitled to summary judgment on this claim.

It is well established that the due process clause of the Fourteenth Amendment does not apply to negligent or intentional deprivations of property where a meaningful state post-deprivation remedy is available. *Hudson v. Palmer*, 468 U.S. 517, 104 S. Ct. 3194, 3204-5 (1984); *Parrott v. Taylor*, 101 S. Ct. 1908 (1981) *overruled in part,* Daniels v. Williams*, 474 U.S. 327 (1986).* The courts have been equally clear that the Illinois Court of Claims constitutes an adequate post-deprivation remedy. *See, e.g., Stewart v. McGinnis*, 5 F.3d 1031 (7th Cir. 1993); *Flowers Cab Co. v. Petitte*, 685 F.2d 192, 193-4 (7 Cir. 1982). The alleged loss of the plaintiff's eyeglasses does not constitute a violation of the plaintiff's constitutional rights. The plaintiff's claim regarding her eyeglasses is merely a property claim and she must go to the Illinois Court of Claims. Consequently, the defendants are granted summary judgment on this issue.

**It is therefore ordered:**

1.    **The defendants, Janice Miller's, Elizabeth McEwing's, Kevin White's, Lieutenant's, Danna Spaulding's, Terry Norgaard's, Grover Gleckler's, Christina Cole's, and James McCarthy's, summary judgment motion, d/e 70, summary judgment motion is granted as to the following claims: 1) failure to intervene 2) strip searches; 3) verbal abuse; 4) inhumane conditions of confinement; 5) deliberate indifferent to serious medical needs; and 6) eyeglasses - property loss. At the close of this lawsuit, the clerk of the court is directed to enter judgment in favor of the defendants, Janice Miller, Elizabeth McEwing, White, Lieutenant, Spaulding, Terry Norgard, Grover Gleckler, Coles, and McCarthy on these claims and against the plaintiff.**

2.    **Based on the foregoing, the plaintiff's claims of excessive force and assault and battery are barred by *Heck v. Humphrey*, and are dismissed, without prejudice.**

3.    **The clerk of the court is directed to terminate Janice Miller, Elizabeth McEwing, Kevin White, Danna Spaulding, Terry Norgaard, Grover Gleckler, Christina Coles, and James McCarthy as defendants, forthwith.**

**Enter this 24th day of February 2006.**

                    s\Harold A. Baker

        _____

                    **HAROLD A. BAKER**
            **UNITED STATES DISTRICT JUDGE**