UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

**Linda A. Caldwell,**
        **Plaintiff,**

        vs.        00-1319

**Lieutenant Elizabeth A. McEwing, et al.,**
        **Defendants.**

**ORDER**

Before the court are the defendants, Dr. Stephen Rivera and Dr. Kul Sood's summary judgment motion [113] and the plaintiff's response [119].

**Standard**

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.56(c); *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001), *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)*; Herman v. National Broadcasting Co., Inc.*, 744 F.2d 604, 607 (7th Cir. 1984), *cert. denied*, 470 U.S. 1028 (1985).  In determining whether factual issues exist, the court must view all the evidence in the light most favorable to the non-moving party.  *Beraha v. Baxter Health Corp.,* 956 F.2d 1436, 1440 (7th Cir. 1992).  Further, this burden can be satisfied by "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.  If such a showing is made, the burden shifts to the non-movant to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Outlaw*, 259 F.3d at 837.  A nonmoving party cannot rest on its pleadings, but must demonstrate that there is admissible evidence that will support its position.  *Tolle v. Carroll Touch, Inc.,* 23 F.3d 174, 178 (7th Cir. 1994).  Credibility questions "defeat summary judgment only '[w]here an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility.'"  *Outlaw*, 259 F.3d at 838, *citing* Advisory Committee Notes, 1963 Amendment to Fed. R. Civ. P. 56(e)(other citations omitted).

Fed. Rule Civ. Pro. Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party there is no 'genuine' issue for trial." *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359 (7th Cir. 1988).  A "metaphysical doubt" will not suffice. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574,

586 (1986). Disputed facts are material only if they might affect the outcome of the suit. *First Ind. Bank v. Baker,* 957 F.2d 506, 507-08 (7th Cir. 1992). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, *247-248, 106 S.Ct. 2505, 2510 (1986).

**Background**

The plaintiff originally brought this lawsuit on September 5, 2000. She filed an amended complaint [44], brought pursuant to 42 U. S. C. Section 1983 on June 24, 2004. Drs. Rivera and Sood, filed their respect answers and affirmative defenses [110 and 111] to the amended complaint. The State of Illinois defendants' summary judgment motions [70 and 71] were granted on February 24, 2006.

Caldwell, pro se prisoner, claims the defendants, Dr. Rivera and Dr. Sood violated her rights under the Eighth Amendment when they failed to provide her with appropriate medical care. The defendants argue that summary judgment must be granted in their favor because there is no genuine issue of material fact that: (1) as to Dr. Rivera, Caldwell failed to exhaust administrative remedies; (2) as to Dr. Sood, he lacks the requisite personal involvement; (3) if the court does not grant summary judgment based on the two former issues, neither defendants was deliberately indifferent to the plaintiff's serious medical needs; and (4) both defendants are qualifiedly immune from damages.

**Fact Allegations**

**A. Allegations Against Dr. Rivera**

Dr. Rivera is referred to in the following paragraphs of the Amended Complaint: 12, 20, 21, 22, 25, 27, 28, 31, 32, 33,46, 102, 103, 114, 115, 145, 155, 160, 162, relief paragraphs l(b), l(c), 2(c), 2(d) and 3. Additionally, Caldwell alleges that Dr. Rivera violated her rights in paragraphs 114 through 121 - though his name is not mentioned in all of those paragraphs.

Specifically, Caldwell alleges that (1) in May 1999, Rivera changed her psychiatric prescription from Paxil to Sinequan; (2) On May 4, 1999, Rivera allegedly authorized the use of force against Caldwell for medical treatment; and (3) On May 4, 1999 Rivera allegedly authorized the use of four-point restraints against Caldwell. Dr. Rivera denies these allegations.

**B. Allegations Against Dr. Sood**

Dr. Sood is referred to in the following paragraphs of the Amended Complaint: 14, 123, 124, 125, 126, 127, 128, 163 (plaintiff alleges that Sood was also involved in paragraphs 122 through l32), relief paragraphs l(b), 2(c) and 3.

Specifically, Caldwell alleges that: on May 6, 1999, Sood allegedly ordered Caldwell to

take an HIV test following her assault of staff by throwing her blood on them and allegedly withheld treatment of her until she took the HIV test. Dr. Sood denies these allegations.

**Statement of Undisputed Facts**[1]

**A.  Caldwell Did Not Exhaust As To Dr. Rivera**

   1.  Terri Anderson is the Chairperson of the Illinois Department of Corrections ("IDOC") Administrative Review Board ("ARB").  As part of those duties, she reviews the appeals of inmate grievances to the ARB.  Appealing to the ARB, as the Corrections' Director's designee, is the final administrative step for appeals of inmate grievances.  (Anderson Aff., ¶ 3).

   2.  Ms. Anderson conducted a thorough search of the ARB records maintained by her office for grievances filed by Caldwell, inmate register No. B07089. Anderson Aff., 77.  That search revealed that there were no grievances filed by Caldwell to the ARB, in accordance with Department of Corrections Rule 504F, regarding the following issues: (1) whether Dr. Rivera changed her psychiatric prescription from Paxil to Sinequan in May of 1999; (2) whether Dr. Rivera authorized the use of force against Caldwell for medical treatment in May of 1999; and (3) whether Dr. Rivera authorized the use of four-point restraints on Caldwell on May 4th or 5th 1999.  *Id.*  From November 1, 1998 to July 1999, Dr. Rivera was employed by Addus Health Care, Inc ("Addus") as a psychiatrist at the Dwight Correctional Center ("Dwight") on a part-time basis. Addus contracts with the State of Illinois, Department of Corrections to provide medical services in correctional facilities.

**B.  Dr. Rivera**

   3.  Dr. Rivera reviewed Caldwell's medical records from late 1998 through December 1999, (see Bates labeled pages 151-359) which reveal that he saw plaintiff a total of 7 times from December 1998 to June 8, 1999, which is the last time Rivera saw her. (Rivera Aff., ¶ 3-4).

   4.  Although Rivera does not have the medical record of his visit from November 3, 1998, the prescriptions (Ex. A, p. 230) indicate that he prescribed Ms. Caldwell Parnelor and stopped the anti-depressant Trazodone (brand name: Desyrel) she had been previously prescribed. (Rivera Aff., ¶ 5).

   5.  Parnelor is used to treat mental/mood problems such as depression.  It may help improve mood and feelings of well-being, relieve anxiety and tension, help you sleep better, and increase your energy level. This medication belongs to a class of medications called tricyclic antidepressants.  It works by affecting the balance of certain natural chemicals neurotransmitters) in the brain.  (Rivera Aff., ¶ 6).

---

   [1]All exhibits can be found attached to the defendants' summary judgment motion and memorandum of law [113], unless otherwise noted.

6. On December 1, 1998, Rivera saw Ms. Caldwell for a psychiatric visit (Ex. A, pp. 150, 230, 358). She was refusing all medications at that time, including the antidepressant Parnelor which he had prescribed for her the previous month. She stated she wanted to be eligible for the work release program and is trying to do it without psychiatric medications. (Ex. A, p. 358). She denied any side effects. Rivera stopped the Pamelor since she was refusing all psychiatric medications and was not a candidate for forced medications. He scheduled a follow up in one month. Id. (Rivera Aff., ¶ 7).

7. On January 5, 1999, Dr. Rivera saw Ms. Caldwell for a psychiatric visit (Ex. A, pp. 151, 177). She was refusing all psychotropic medications at that time, and reported that she was doing well without them. She denied any depression. No psychiatric medications were clinically indicated based on her self reports and Rivera's personal observations of her. Rivera scheduled a routine follow up in one month. (Rivera Aff., ¶ 8).

8. On February 2, 1999, Dr. Rivera saw Ms. Caldwell for a psychiatric visit (Ex. A, pp. 151, 178). She was refusing all psychotropic medications at that time, and reported that she was doing well without them. She denied any depression, suicidality, homicidality, psychosis, mania or psychiatric problems. She had no complaints on this visit. No psychiatric medications were clinically indicated based on her self reports and Rivera's personal observations of her. Rivera scheduled a routine follow up in one month. (Rivera Aff., ¶ 9).

9. On March 1, 1999, Ms. Caldwell refused to see Dr. Rivera. (Rivera Aff., ¶ 10).

10. On April 1, 1999, Dr. Rivera saw Ms. Caldwell for a psychiatric visit (Ex. A, pp. 153, 180). She was refusing all psychotropic medications at that time, and reported that she was doing well without them. She denied any depression, suicidality, homicidality, psychosis, mania or psychiatric problems. She had no complaints on this visit. No psychiatric medications were clinically indicated based on her self reports and Rivera's personal observations of her. Dr. Rivera scheduled a routine follow up in three months. (Rivera Aff., ¶ 11)).

11. On May 4, 1999 at 11:30 a.m., Dr. Rivera saw Ms. Caldwell in her room in the mental health unit. Earlier that day she reported throwing blood on the correctional officers and was subsequently locked down, (Ex. A, p. 359). She was refusing to talk with anybody except Gene Peterson, the psychologist. She was uncooperative and would not answer Dr. Rivera's questions. She did not appear psychotic. *Id.* She was still refusing all medications. (See p. 154). It was Dr. Rivera's conclusion that her difficulty at this time was behavioral and that she was not psychotic as he had followed her for many months. (Ex. A, p. 359). Rivera noted that she had not been on any psychotropic medication for the past 5 or 6 months due to the fact that she refused it and denied psychiatric problems. *Id.* During that times she was free of psychosis and major behavioral problems. It was Rivera's belief that she was acting out, and he recommended segregation for the incident earlier that day. Rivera did not believe that putting her on forced medications was warranted. Rivera scheduled follow up on an as needed basis only. (Rivera Aff., TI 12).

12. On May 4, 1999, at approximately 10:05 pm, Ms. Caldwell's medical records indicate that Dr. Rivera gave an order approving plaintiff to be placed in mental health therapeutic restraints for up to 16 hours for her medical safety and for the safety of correctional staff. (Ex. A at 189- 190; see also, Doc. #7 1, Ex. I, 774-5). (Rivera Aff., ¶ 13).

13. Dr. Rivera has no independent recollection of giving this order. (Rivera Aff., ¶ 14).

14. Even if Dr. Rivera did give the order, the records do not indicate who contacted him, what time they contacted him, and what was said. It is not clear from the medical records whether he was contacted at 10:05 or if this is the time the restraints were implemented. (Rivera Aff., ¶ 15).

15. Typically when staff was wanting to restrain an inmate, they would contact Rivera and advise him of the facts and circumstances justifying restraints. (Rivera Aff., ¶ 16).

16. Although Rivera does not remember authorizing the restraints, he has some recollection that around this time period, Ms. Caldwell had allegedly been in an altercation with guards and was throwing blood and posed a security threat. (Rivera Aff., ¶ 17).

17. Based on these reports and in accordance with IDOC policy, it would have been appropriate to place her in restraints for her personal safety and the safety of correctional staff. (Rivera Aff., ¶ 18).

18. Rivera would never have authorized the use of restraints unless Rivera was given sufficient information by correctional staff to form the opinion that the inmate posed a threat to herself and or others. (Rivera Aff., ¶ 19).

19. A May 4, 1999 medical examination the evening following the altercation revealed that there were no visible injuries to plaintiff's left shoulder. (Ex. 6, Miller Aff., ¶ 10). On May 5, 1999, Nurse Miller's medical examination concluded that Ms. Caldwell had a swollen left eye and half (½) inch cut on her right middle finger, but no bumps or redness were able to be verified by Nurse Miller. (Ex. 6, Miller Aff., ¶ 14).

20. After less than 16 hours, on May 5, 1999, at 1:35 p.m., psychologist Gene Peterson ordered that plaintiff be removed from the restraints and placed on suicide watch in the stripped cell until May 6, 1999 (Ex. A at p. 185). (Rivera Aff., ¶ 20).

21. Dr. Rivera does not recall seeing plaintiff come to the Health Care Unit ("HCU") any time on May 4-6, 1999 for an HIV test or to be seen by him. (See also Doc. #71, Ex. 6, Miller Aff., ¶ 20). Her medical records do not indicate that Rivera saw her for such purpose. Rivera did see her, however, on May 4, 1999 for a psychiatric evaluation wherein she refused all medications (Ex. A, p. 154). (Rivera Aff,, 721).

22. Had plaintiff come to HCU that day and rehsed to take an HIV test, Rivera would not

5

have refused to provide her psychiatric care. (Rivera Aff., ¶ 22).

23. On May 6, 1999, around 2:20 p.m., the plaintiff saw psychologist, Gene Petersen, who determined that the plaintiff no longer needed to be on suicide watch and also stated that she could have her personal property according to segregation status rules (Ex. A, at 192-1 93). (Rivera Aff., ¶ 23).

24. At no time did Rivera withhold medical treatment from the plaintiff. (Rivera Aff., ¶ 24).

25. Rivera did not interrogate the plaintiff about her alleged altercation with the correctional officers on May 4, 1999. Rivera did not demand to know what it was that she had thrown on Officer Hardiman. (Rivera Aff., ¶ 24).

26. Dr. Rivera does not recall plaintiff mentioning anything about the adjustment committee. (Rivera Aff., ¶ 25).

27. Dr. Rivera does not recall Nurse Miller indicating that plaintiff was required to take an HIV test before she would be examined for her injuries. However, if Ms. Caldwell had thrown blood on officers, it would have been medically justified for her submit to an HIV test for the safety of staff, (Rivera Aff., ¶ 27).

28. Ms. Caldwell's medical records do not indicate that Rivera ever prescribed for her Sinequan (generic: Doxepin HCI) or that she was otherwise taking it at any time Rivera treated her from November 1998 to June 1999. (Rivera Aff., 11 28).

29. Each time Dr. Rivera saw Ms. Caldwell, it arose from either being asked to do so by Dale Hoke, a psychologist and the director of the mental health unit, or because she was scheduled to be seen by me from a previous visit and her name was on the list to be seen that day. (Rivera Aff., ¶ 29).

**C. Dr. Sood**

30. From November 1, 1998 to March 14, 2000, Dr. Sood was employed by Addus Health Care, Inc ("Addus") as a physician at the Dwight Correctional Center ("Dwight"). He has over ten (10) years experience working as a physician for the Department of Corrections. (Sood Aff., ¶ 2).

31. Dr. Sood reviewed Caldwell's medical records from late 1998 through December 1999, which do not indicate that he ever treated her during any relevant time to her Complaint. (Sood Aff., ¶ 3-4).

32. Dr. Sood does not recall ever treating Ms. Caldwell and does not recall ever having met her. (Sood Aff., ¶ 5). Specifically, Dr. Sood does not recall ordering Ms. Caldwell to take

an HIV test following her alleged assault of staff (throwing blood on them), and does not recall any blood throwing incidents in general. (Sood Aff., ¶ 6).

33. Dr. Sood did not tell Ms. Caldwell that he would refuse to treat her for any injuries she allegedly suffered on May 4, 1999 during an alleged altercation with officers. (Sood Aff., ¶ 7).

34. Dr. Sood would never and has never told any inmate that he is withholding medical treatment from them. (Sood Aff., ¶ 8).

35. If an inmate were to throw blood on correctional staff, it would be appropriate to request that the inmate take an HIV test for the safety of correctional staff. (Sood Aff., ¶ 9).

**D. Caldwell's Testimony**

36. Caldwell has "no idea" whether it is true that she refused medication after her visit with Dr. Rivera on December 1, 1998, although she does recall instances where she refused medications. (Ex. 4, Caldwell August 16, 2006 Dep., pp. 12-1 3). She has "no idea" when she refused the medications prior to May 14, 1999. (Id., p. 20). She also admits refusing to see Dr. Rivera. (Id., p. 13).

37. Caldwell admits that the Pamelor helped her sleep. (Ex. 4, Caldwell August 16, 2006 Dep., p. 35).

38. On May 4, 1999 at 7:30 am, when Caldwell alleges Dr. Rivera authorized correctional staff to "bum rush" her to force to her submit to medical treatment, the staff was unsuccessful in sticking her with the needle containing the medication as she fought back. (Ex. 5, Caldwell January 10, 2005 Dep., pp. 9- 10). Plaintiff admitted assaulting and throwing liquid on Officer Hardimon earlier that morning for which she was disciplined and found guilty of assault. *Id.,* p. 11.

39. At her January 1, 2005 deposition, Caldwell did not know who ordered the four point restraints to be placed on her but speculates it was Dr. Rivera because he was the on call doctor. (Ex. 5, Caldwell January 10, 2005 Dep., p. 51).

40. Although Caldwell criticizes Dr. Rivera for not coming to visit her following her placement in four-point restraints, she is not aware when he was at the institution. (Ex. 5, Caldwell January 10, 2005 Dep., p. 60).

41. Plaintiff criticizes Dr. Sood for allegedly badgering her about the blood throwing incident on May 4, 1999, but admits that she was found guilty of assaulting the officers by throwing blood on them. (Ex. 4, Caldwell August 16, 2006 Dep., p. 8). 42. Caldwell admits that Dr. Sood's name does not appear in her medical records. (Ex. 4, Caldwell August 16, 2006 Dep., p. 10).

43. Caldwell cannot explain why it is not noted in her medical records that Dr. Rivera was present and gave the order for forced medication on May 4, 1999. (Ex. 4, Caldwell August 16, 2006 Dep., p. 17).

44. Although Caldwell's medical records do not indicate that she was prescribed the drug Sinequan, she insists she was taking it "until. . . she started having the side effects" but cannot remember when she stopped taking it, but it was something like January or February 1999. (Ex. 4, Caldwell August 14, 2006 Dep., pp. 22-23).

45. Caldwell has never spoken with Dr. Rivera about his alleged order to put her in four-point restraints on May 4, 1999 at 10:05 pm and does not know what Dr. Rivera was told prior to her being placed in restraints. She believes that Dr. Rivera was not physically present when the restraints were put on her by staff. (Ex. 4, Caldwell August 16, 2006 Dep., pp. 25-26).

46. When asked if she disputes the fact that she was checked every 10 minutes by staff after being placed in restraints for the 16 hours she was in them, Caldwell indicated that she had "no recollection." (Ex. 4, Caldwell 811 6/06 Dep., p. 26).

47. Caldwell admits that prior to being placed in restraints, she was involved in a physical altercation with officers for which she was issued discipline and convicted criminally. (Ex. 4, Caldwell August 16, 2006 Dep., p. 29).

48. Caldwell has no evidence that he medical records were altered or "doctored." (Ex. 4, Caldwell August 16, 2006 Dep., p.30).

49. Plaintiff admits that she never saw Dr. Rivera after June 8, 1999. (Ex. 4, Caldwell August 16, 2006 Dep., p. 21).

50. No medical doctor has criticized the care rendered by either Drs. Rivera or Sood to the plaintiff. (Ex. 5, Caldwell January 10, 2005 Dep., pp. 66-68).

51. Psychologist Gene Petersen never criticized Dr. Rivera's treatment of her. (Ex. 4, Caldwell August 16, 2006 Dep., p. 34).

52. Caldwell has no medical training. (Ex. 4, CaIdwell8/16/06 Dep., p. 25).

Caldwell's response fails to create a genuine issue of material fact. The non-moving party opposing a Motion for Summary Judgment must go beyond the pleadings and support her assertions with documentary evidence. *Warsco v. Preferred Technical Group*, 258 F. 3d 557, 563 (7th Cir. 2001). Plaintiff has generally failed in this burden. For the record, the court notes some of the plaintiff's attempts to create a genuine issue of material fact.

1. As a general observation, the plaintiff's statements offered to ostensibly contradict defendants' statements of material facts are, in reality: questions, restatements from various paragraphs from her complaint, conclusions and/or characterizations. Many times, plaintiff

either admits the statements proffered by the defendants and/or fails to respond to them by proper citations to the record.

    2. On page 2, plaintiff argues that her exhibit no. 5 (Doc. 119-2, p. 13; *see also,* Rivera Aff., Ex. A, p. Caldwell-0359) establishes that he was at her cell when the order was given to put her in therapeutic restraints. If this is plaintiff's contention, it is erroneous because Dr. Rivera's handwritten SOAP note entry from which this typewritten report was predicated, indicates he was at her cell at 11:30 a.m., not around 10:05 p.m., when she was put in restraints. (*See* Doc. 119-4, p. 17; *see also* Rivera Aff., Ex. A, p. Caldwell-0154).

    3. On page 2 of plaintiff's response, she also admits that she did not know what medication Dr. Rivera gave her. Apparently she thought it was Sinequan, but the medical records do not support plaintiff's contention. It really does not matter, though, because plaintiff admitted in her deposition .. and it is also well documented in her medical records .. that she refused to take her medications.

    4. Plaintiff also argues on page 2 that Dr. Rivera knew, or should have known, about her Hepatitis C and the withdrawal possibilities of Paxil. This is inconsistent with the allegations in her complaint which indicated that she wanted Paxil. She cannot change her theory now. Plaintiff also argues that she does not like the drugs Dr. Rivera prescribed for her and admits that, "so yes, I refused meds that had me fighting in my sleep." (Doc. 119, p. 2). This entire line of argument by the plaintiff shows that she simply has a disagreement with the medications prescribed for her which is not actionable. *Benson v. Cody*, 761 F. 2d 335, 341 (7th Cir. 1985).

    5. Plaintiff argues at various places in her Response that Dr. Sood "bribed" her to take an HIV test. This is simply a conclusion unsupported by any citations to the record. Caldwell testified she refused the HIV test.

    6. Plaintiff has failed to show that she exhausted her administrative remedies as to Dr. Rivera. She attaches Exhibits 2 and 3 to her response (*see* Doc. 119-2, pp. 3-9 to her Response) apparently to show she did exhaust her administrative remedies. As to Exhibit 3 (Doc. 119-2, pp. 7-9), there is no evidence that the grievance was acted upon by the Administrative Review Board ("ARB"). This grievance referenced an attempted blood draw on May 4, 1999 and does not mention Dr. Rivera. As to Exhibit 2 (Doc. 119-2, pp. 3-6), this merely references Caldwell's request to change psychiatrists.

    7. On page 4 of her response, plaintiff references the drugs she is *now* taking. This has no relevance to whether or not these defendants violated her constitutional rights. This is not sufficient to create a genuine issue of material fact. She also argues on page 4 that the defendants have not presented any evidence that she was refusing her medications. However, not only did she admit refusing to take her medications in this Response (*see* Doc. 119, p. 2, ¶4), her medical records (documenting her visits with Dr. Rivera) are littered with references regarding her refusal to take medications.

8. Plaintiff argues that Dr. Rivera "chose a less expensive and less adequate means to treat me." (*See* Doc. 119, p. 4). Again, this is a conclusion and is unsupported by any facts. No evidence has been presented as to the cost of medications, and no medical evidence has been presented regarding the inadequacy of the medications prescribed by Rivera, which plaintiff refused to take.

9. On page 5 of her response, among other places, plaintiff argues that Dr. Rivera allowed the guards to "bum rush" her. This is merely a conclusion or characterization and is not a fact.

10. On page 5, plaintiff argues that Dr. Rivera presented no evidence for the change of diagnosis or explanation that almost all mentally ill think that when they are doing okay thy stop their medications. This is totally irrelevant, and in event, Dr. Rivera is not required to present any evidence. This is plaintiff's burden.

11. On page 6, plaintiff argues that if restraints were IDOC policy, she was not the first to assault staff. She further goes on to admit assaulting staff and that she did not know why she did it except that "all that was going on with me, and she [the officer] pushed the button to send me off." (*See* Doc. 119, p. 6).

12. On page 7, plaintiff argues that Dr. Rivera "did badger me with questions when he came to the door at 7:30 a.m." She also makes the same characterizations with respect to Dr. Sood.

13. On page 7, plaintiff argues that Dr. Sood did treat her and saw her in November 1998 and May 6, 1998. The plaintiff argues that Sood allegedly prescribed medication and ordered a chest x-ray in 1998. On page 14, plaintiff argues that Dr. Sood's name was on her medical records in 1998. However, these time periods are not encompassed within the time frame referenced in her complaint.

14. On page 12, as in several other places in plaintiff's Response, in an attempt to show defendants' lack of professional judgment, plaintiff argues that she has been on psychotropic medication for over 20 years and knows the medications. Notwithstanding that, she lacks the requisite medical training to render such an opinion against Dr. Rivera.

15. On page 12, plaintiff also offers an anecdote about psychiatric patients going off their medications and the resulting bad side effects. This is not relevant and is not supported by any citations to the record.

16. On page 15, plaintiff cites the oft quoted, "so blatantly inappropriate as to evidence intentional mistreatment" (*see* Doc. 119, p. 15, citing *Thomas v. Pate*, 493 F. 2d 151, 158 (7th Cir. 1974)), in an attempt to show that defendants were deliberately indifferent. She offers no evidence whatsoever to support her statement that the defendants' treatment of her was blatantly inappropriate, let alone inappropriate. So, this quote, having no facts to support it, does not

10

advance Caldwell's claim.

17. On page 16, plaintiff complains of a delay in treatment by Dr. Rivera. However, in order to substantiate such a claim, a plaintiff is obligated to place in the record verifying medical evidence showing injury as a result of the delay. *Walker v. Benjamin,* 293 F. 3d 1030, 1038 (7th Cir. 2002). She has offered none. Therefore, she cannot proceed on such a theory.

18. On page 16 of her response, plaintiff cites 405 ILCS 5/2-108 for the proposition that Dr. Rivera violated Illinois law regarding the use of therapeutic restraints. This statute does not apply to the plaintiff as a prisoner in the Illinois Department of Corrections. Rather, Section 405 of the Illinois Compiled Statutes pertains to the Mental Health And Developmental Disabilities Code. *See, e.g.*, 405 ILCS 5/1-100. The provisions in Chapter 405 apply to the Department of Human Services in its capacity as successor to the Department of Mental Health and Developmental Disabilities and to the corresponding programs, employees, facilities, service providers or service recipients of the Department of Human Services. 405 ILCS 5/1-105. It does not apply to the Department of Corrections.

19. Even if plaintiff were correct that Section 2-108 applied (which it does not), there is an emergency exception for such an order to be given by a qualified person where a physician or clinical psychologist is not available. 405 ILCS 5/2-108(b). Therefore, Dr. Rivera need not have been personally present to have issued the order.

20. On page 18, plaintiff argues that another inmate, Jackie Duckworth, broke an officer's nose but was not put in restraints. This is irrelevant to plaintiff's claim as to whether these defendants violated her constitutional rights.

## Discussion and Conclusion

The plaintiff has failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA), 42 U.S.C. §1997e(a), et seq. It is well-established that the PLRA requires a prisoner to exhaust his administrative remedies prior to the commencement of suit under $1983. 42 U.S.C. g1997e; *Booth v. Churner*, 532 US. 731 (2001); *Porter v. Nustle*, 534 U.S. 516,532 (2002); *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002). Attached to this Memorandum as Exhibit 1 is the Affidavit of Terri Anderson, the Administrative Review Board ("ARB") Chairperson. As part of those duties, she reviews the appeals of inmate grievances to the ARB. *Id.* Appealing to the ARB, as the Corrections' Director's designee, is the final administrative step for appeals of inmate grievances. Ms. Anderson conducted a thorough search of the ARB records maintained by her office for grievances filed by Caldwell, inmate register No. B07089. That search revealed that there were no grievances filed by Caldwell to the ARB, in accordance with Department of Corrections Rule 504F, regarding the following issues: (1) whether Dr. Rivera changed her psychiatric prescription from Paxil to Sinequan in May of 1999; (2) whether Dr. Rivera authorized the use of force against Caldwell for medical treatment in May of 1999; and (3) whether Dr. Rivera authorized the use of 4-point restraint on Caldwell on May 4 or 5, 1999.

In response, Caldwell asserts that she did exhaust administrative remedies and points to her grievance attached to her response [11] as Exhibits 2 and 3.  She argues that the defendants were put on notice and that is all a grievance must do.  Exhibit 3 (Doc. 119-2, pp. 7-9), there is no evidence that the grievance was acted upon by the Administrative Review Board ("ARB").  This grievance referenced an attempted blood draw on May 4, 1999 and does not mention Dr. Rivera.  As to Exhibit 2 (Doc. 119-2, pp. 3-6), this merely references Caldwell's request to change psychiatrists.  While plaintiff is correct that notice pleading is arguably sufficient for inmate grievances, this grievance does not pertain to any of the specific issues or the majority of the time periods raised in her complaint: changes of medication, therapeutic restraint issues or forced medication issues.  It is clear that Caldwell did not exhaust her administrative remedies as to any of the issues she has raised against Dr. Rivera in her Amended Complaint.  The only notice she gave to administration regarding Dr. Rivera is that she wanted a different doctor.  Her grievance was denied because it was not the prison's policy to switch doctors at the whim of an inmate.  Further, the plaintiff is not constitutionally entitled to any specific doctor.  Because she did not grieve any of the issues she alleges against Dr. Rivera in her complaint, Dr. Rivera is entitled to summary judgment.

As to Dr. Sood, he argues that the requisite personal involvement has not been met by the plaintiff.  It is well-established that a Section 1983 defendant cannot be held liable on a respondeat superior theory.  *Sanvillle v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001) (internal citations omitted). Dr. Sood's name does not appear anywhere in the plaintiffs medical records. (see Ex. 2, Rivera Aff. Ex. A).  Caldwell agreed that Dr. Sood's name does not appear in the plaintiff's medical record, and she has no evidence that they were altered in any way.  Finally, Dr. Sood averred that he has no recollection of Caldwell or the events to which she refers in the Amended Complaint.  Therefore, Dr. Sood lacks the requisite personal involvement to be held liable as a Section 1983 defendant.

In order to present a valid claim of medical needs deprivation under the Eighth Amendment, a prisoner must allege acts or omissions sufficiently harmful to demonstrate deliberate indifference to the prisoner's serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97 at 106 (1976).  The deliberate indifference standard contains both an objective element and a subjective element.  The alleged deprivation must be objectively sufficiently serious.  *Farmer v. Brennan*, 51 1 U.S. 825, 834 (1994).  An inmate's medical needs are sufficiently serious if the "failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain. "' *Gutierrez v. Peters*, 111 F.3d  364, 1373 (7th Cir. 1997).

In addition, a defendant must have a sufficiently culpable state of mind, a subjective standard.  *Farmer*, 511 U.S. at 834.  The plaintiff must show that the defendant knew of and disregarded an excessive risk to plaintiffs health and safety.  The defendant must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference.  *Farmer*, 511 US. at 837.  It is well established that negligence - or even gross negligence - in treating an inmate's medical condition is not deliberate indifference.  *Snipes v. DeTella*, 985 F.3d 586, 590 (1996).  The Seventh Circuit has observed that "deliberate indifference" is synonymous with intentional or reckless conduct, and that

"reckless" describes conduct so dangerous that the deliberate nature of the defendant's actions can be inferred. *See Qian v. Kautz*, 168 F.3d 949, 955 (7th Cir. 1999).

The court agrees with the defendants that Caldwell has not established a serious medical needs, and even if she has, neither Dr. Rivera, nor Dr. Sood were deliberately indifferent. The court also agrees with the defendants that it is difficult to pinpoint precisely what it is that the plaintiff believes constitute her serious medical needs. The court assumes that she is referring generally to her need for psychiatric medication and the need for treatment following her assault of the guards on May 4, 1999. As to her psychiatric care, she has not established that it is a serious medical need. She regularly met with Dr. Rivera and consistently refused to take her medications. She also refused treatment. Dr. Rivera did not feel it was warranted to force-medicate her. These undisputed facts are simply inconsistent with one who claims to have a serious psychiatric need. As to her alleged injuries following her assault of the guards on May 4, 1999, the medical records establish that Caldwell did not have a serious medical need. Nurse Miller (Ex. 6) averred that a May 4, 1999 medical examination revealed that there were no visible injuries to plaintiff's left shoulder. On May 5, 1999, Nurse Miller's medical examination concluded that Caldwell had a swollen left eye and a one-half (½) inch cut on her right middle finger, but no bumps or redness were able to be verified by Nurse Miller. There is no evidence that the half-inch cut required stitches or that it was deep. These minor bruises and scrapes do not constitute a serious medical need. *See Pinkston v. Madry*, 440 F.3d 879, 891(7th Cir. 2006)(split lip and swollen cheek not a serious medical need); *Davis v. Jones*, 936 F.2d 971, 972-973 (7th Cir. 1991)(one-inch laceration to temple not requiring stitches and scraped elbow not a serious medical need). Therefore, Caldwell has failed to establish any injuries requiring constitutional protection, and summary judgment is appropriate.

Dr. Sood was not deliberately indifferent. Even if Caldwell had a serious medical needs, Dr. Sood was not deliberately indifferent. In order to be held liable under the deliberate indifference standard, the defendant must know of and disregard an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Farmer,* 511 U.S. at 837, 114 S. Ct. 1970. The defendants assert that there is no evidence that Dr. Sood was aware of any serious medical injuries sustained by Caldwell as his name appears nowhere in her medical records, and he has no recollection of either her or the events described in her Amended Complaint. In her response, the plaintiff claims that Dr. Sood treated her on May 6, 1999 and in November 1998 and ordered a chest x-ray for her in September 1998. The relevant period of the plaintiff's complaint is May 6, 1999, the day Sood allegedly ordered Caldwell to take an HIV test following her assault of staff by throwing her blood on them and allegedly withheld treatment of her until she took the HIV test. Dr. Sood denies these allegations. In fact, in her complaint [44] at paragraph 127, the plaintiff alleges that it was Miller, not Sood, that told the plaintiff she had to take an HIV test and then they would look at her injuries. Even if the plaintiff could establish some involvement by Dr. Sood, the most she has established is that he inquired about her throwing blood on the guards and asked her to take an AIDS test, which Caldwell says she refused to take. *See* the plaintiff's allegations in her amended complaint, paragraphs 122-127. There is nothing unconstitutional for a doctor to ask a

13

patient a medical question and to submit to a medical test. There is no evidence that Caldwell was physically harmed during this alleged encounter where Dr. Sood was allegedly present (she instead alleges she was injured in an earlier scuffle with the guards on May 4, 1999). There is no evidence that Dr. Sood ever laid a hand on her, directed anyone else to do so or acquiesced in same. Even if he had, it would have been imminently reasonable given the fact that she had just thrown blood on the guards and put the staff and other inmates in harms way. Finally, there is no evidence that Dr. Sood ignored any of her injuries allegedly sustained in her guard assault as Nurse Miller addressed these. In short, there is no basis to conclude that Dr. Sood was deliberately indifferent to her allegedly serious medical needs.

Further, even if the plaintiff had exhausted administrative remedies for her claims against Dr. Rivera, the court finds that he was not deliberately indifferent on the basis that Caldwell claims he changed her medication from Paxil to Sinequan. So what. As a threshold matter, the following rules of law are central to this issue: (i) when an inmate with no medical training disagrees with his medical providers' decisions to perform (or not perform) certain medical procedures, this does not give rise to a cause of action under Section 1983. *Benson v. Cady*, 761 F.2d 335, 341 (7th Cir. 1985); *Snipes*, 95 F.3d at 591-92 (7th Cir. 1996); *Est. of Cole v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996) ("differences in opinion among medical personnel regarding a patient's appropriate treatment do not rise to deliberate indifference"); (ii) the Eighth Amendment simply does not entitle an inmate to demand specific care or be entitled to the best care that is available (*Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997)), nor does the constitution require doctors to keep inmates pain free or administer the least painful treatment. *Snipes* 95 F.3d at 592; (iii) whether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference, except in the most extreme situations, i.e., when the medical treatment is "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition." *Id.* (*quoting Thomas v. Pate*, 493 F.2d 1 5 1, 158 (7th Cir. 1974), vacated and remanded on other grounds sub nom., *Cannon v. Thomas*, 419 US. 813,95 S. Ct. 288 (1974)). Caldwell is demanding specific care by requesting a particular drug. This is not actionable. *Forbes*, 112 F. 3d at 267. The decision to prescribe medicine is appropriately made by the physician, not the inmate. Moreover, the record completely fails to support Caldwell's complaint. There is no evidence Caldwell was ever on Sinequan. On November 3, 1998, Dr. Rivera stopped Caldwell's Trazadone (an anti-depressant) and put her on a different anti-depressant, Pamelor, which she refused to take. So, on December 1, 1998, Dr. Rivera discontinued Caldwell's prescription for Pamelor and never put her on another one because she was refusing to take any psychiatric medications. For the brief period she was taking the Pamelor, she admitted that it helped her sleep. Paxil, like Sinequan, Pamelor and Trazodone, are anti-depressants. Caldwell's theory is that she had the right to demand a specific type of anti-depressant. There is no objective medical evidence to support this notion. Consequently, even if Caldwell could establish, which she cannot, that Dr. Rivera refused to put her on Paxil, she has not shown that his conduct was "such a substantial departure from accepted professional judgment, practice, or standard as to demonstrate that the person responsible did not base the decision on such judgment." *Youngberg v. Romero*, 457 U.S. 307,323 (1982); *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254,262 (7th Cir. 1996). Nor was it so blatantly inappropriate as to evidence intentional mistreatment likely

to seriously aggravate her psychiatric condition. As such, Dr. Rivera was not deliberately indifferent.

Caldwell also claims that her constitutional rights were violated by Rivera's alleged authorization of four point restraints. Assuming, urguendo, that Dr. Rivera authorized the restraints (he does not remember doing so, but the medical records indicate he did), there is nothing constitutionally inappropriate about such an order, especially in the instant case. *Bruscino v. Curlson*, 854 F.2d 162, 164 (7th Cir. 1988). The restraints were easily justified to maintain or restore discipline given Caldwell's assault of staff for which she was disciplined and convicted of a crime. Caldwell assaulted 2-15 of the prison staff, hit staff with mop handle, urinated and bleed on floor, defecated on day room floor, threw food at staff."). See Aff. Ex. A, p. 182. Further, the Plaintiff's inability to offer a legitimate explanation as to why she assaulted staff proves that IDOC staff had a reasonable belief that Caldwell was a danger to both herself and others. Consequently, the use of restraints on an erratically behaving inmate who has assaulted staff was more than justified under these facts. The length of time was less than 16 hours - from May 4, 1999 at 10:05 pm to May 5, 1999 at 1:35 pm. *See* Rivera Aff. Ex. A, pp. 190, 185. Finally, Caldwell was checked every 10 minutes during the restraint period. *See* Rivera Aff. Ex. A, pp. 183-185). Based on the plaintiff's conduct, there is no evidence to suggest that Dr. Rivera did not exercise his professional medical judgment. In fact, the whole notion of whether to place an inmate in restraints is uniquely one of professional judgment. There is no
evidence that the use of therapeutic restraints is not an accepted psychiatric practice. Given that, Dr. Rivera is entitled to summary judgment on that claim.

The plaintiff makes a vague allegation that Dr. Rivera forced her to submit to medical treatment. It is not clear whether she is referring to the AIDS test or something else. However, there is no medical evidence to substantiate this claim. Dr. Rivera denies any such conduct. The court agrees with the defendants assertion that it appears that Caldwell has confused Dr. Rivera and Dr. Sood and has repeated these allegations just to see if anything will stick to the wall. For the reasons stated in the analysis of Dr. Sood, there was nothing wrong with asking Caldwell to submit to an AIDS test given her blood throwing and assault of the officers. Even if Dr. Rivera authorized forced medical treatment, Caldwell refused it, and there is no medical evidence to suggest she was injured as a result. Therefore, Dr. Rivera is entitled to summary judgment on this claim.

Finally, the court notes that the plaintiff has failed to serve Dr. Michael Puisi. However, the only allegations the plaintiff makes against Dr. Michael Puisi is that he chose to ignore her explanation of how she sustained her injuries. She concluded that he was intent on denying her appropriate medical care, so she got up and left the office. She alleged that nothing more needed to be said and that he was refusing to provide essential medical care in line with her injuries. The court has already found that the plaintiff did not suffer from a serious medical need and the nurse addressed the plaintiff's minor injuries. Therefore, pursuant to 28 U.S.C. §1915A(b) and Fed. R. Civ. Pro. Rule 12(b)(6), the plaintiff's claim against Dr. Puisi is dismissed.

It is therefore ordered:

1. Pursuant to 28 U.S.C. §1915A(b) and Fed. R. Civ. Pro. Rule 12(b)(6), the plaintiff's claim against Dr. Puisi is dismissed. The clerk of the court is directed to terminate defendant Puisi, forthwith.
2. Pursuant to Fed. R. Civ. Pro. Rule 56(c), the defendant's motion for summary judgment is granted [113]. This case is terminated in its entirety. The clerk of the court is directed to enter judgment in favor of the defendants and against the plaintiff.
3. If the plaintiff wishes to appeal this dismissal, she may file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C). If the plaintiff does choose to appeal, she will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal. Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate a strike under 28 U.S.C. 1915(g).
4. The parties to bear their own costs.

Enter this 28th day of September 2006.

                                    **s\Harold A. Baker**
                          _____
                                      Harold A. Baker
                          United States District Court